NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

MILLMEN & CABINET MAKERS UN-
ION, LOCAL NO. 550, UNITED BROTH-
ERHOOD OF CARPENTERS & JOIN-
ERS OF AMERICA, AFL–CIO, Re-
spondent.

No. 20850.

United States Court of Appeals
Ninth Circuit.

Oct. 19, 1966.

Arnold Ordman, Gen. Counsel, Domi-
nick L. Manoli, Associate Gen. Counsel,
Marcel Mallet-Prevost, Asst. Gen. Coun-
sel, Gary Green, Atty., N.L.R.B., Wash-
ington, D. C., for petitioner.

Victor J. Van Bourg, Levy, DeRoy,
Geffner & Van Bourg, San Francisco,
Cal., for respondent.

Before CHAMBERS, CECIL * and
DUNIWAY, Circuit Judges.

* Lester L. Cecil, Senior Circuit Judge, Sixth Circuit, sitting by designation.

CECIL, Senior Circuit Judge.

This cause is before the Court upon the petition of the National Labor Relations Board for enforcement of the Board's order, issued July 2, 1965, against Millmen & Cabinet Makers Union, Local No. 550, United Brotherhood of Carpenters & Joiners of America, AFL–CIO, (the Union), respondent herein. This Court has jurisdiction of the proceeding, the alleged unfair labor practice having occurred in Fremont, California, within this judicial circuit. (Section 160(e), Title 29, U.S.C.)

The facts are not in dispute. It is conceded by counsel for the respondent that the facts are substantially as stated in the Board's findings of facts. During 1964, BESCO, a partnership, engaged in the building and construction business as a general contractor, was building homes on a large subdivision in Fremont called Cabrillo Park. It was building homes at the rate of about 200 per year. Model homes were open for inspection by potential buyers in July of 1964 and BESCO had a sales office, at the site, in full operation. The partnership contemplated several years of further development in the area.

At the time the alleged unfair labor practice occurred there were between 90 and 100 construction employees working on the BESCO project. About one half of these employees were working directly for BESCO and the other half were employed by various BESCO subcontractors. Most, if not all, of these employees were covered by collective bargaining agreements between their employers and various AFL–CIO building trades unions.

Most of the lumber used by BESCO on the Cabrillo Park project was being purchased from Steiner Lumber Company. On July 21st, one of the BESCO partners observed two men, representatives of the Union, picketing at the regular entrance to the Cabrillo Park subdivision. Their picket signs bore legends as follows:

"Steiner Lumber Co. Unfair Pre-cut lumber being delivered to this job by Steiner of Oroville is prepared at wages and conditions below those established by United Brotherhood of Carpenters and Millmen, 550, AFL–CIO; Consumer picket."

and

"Steiner Lumber Company UNFAIR. Directed to Consumers only. Pre-cut lumber being delivered to this job by Steiner Lbr. of Oroville is prepared at wages and conditions below those established by United Brotherhood of Carpenters, Millmen, 550, AFL–CIO."

There is testimony in the record and the Board found as a fact that upon inquiry, counsel for BESCO was told by counsel for the Union, "Well, it would be quite simple to get the fixtures removed and the pickets removed. All you have to do is stop buying from Steiner Lumber." Apart from this conversation, no BESCO representative was ever advised by the Union how to effect the removal of the pickets, nor did the Union ever assert that it had any grievance or labor dispute with BESCO. No Union representative ever advised BESCO that the pickets were not directed at BESCO or that the Union did not intend to cause a work stoppage at Cabrillo Park. Neither were the construction workers so advised.

The picketing continued until September 15th. The pickets were at the entrance of the subdivision from 7:30 a. m. until noon on Monday through Friday. The construction workers reported to work at 8 a. m. The sales office was open daily from 10 a. m. until 7 p. m., including Saturdays and Sundays. During the period of picketing the Steiner Lumber Company had no employees at the Cabrillo Park project. Steiner's truck drivers delivered lumber at the project but were there only long enough to unload their trucks. They were members of the Teamsters' local union. During the times material here, there was no labor dispute between the Teamsters and Steiner.

A member of the Plumbers and Pipefitters Local 444 refused to work at the

project because of the pickets. Aside from this one incident there is no report of any other employee refusing to work by reason of the picketing.

Upon these facts the Board concluded that the Union was engaged in an unfair labor practice in violation of Section 8 (b) (4) (i) (ii) (B) [1] of the National Labor Relations Act. (Section 158, Title 29, U.S.C.) The Board found that by picketing the entrance to the BESCO project the Union induced and encouraged employees of BESCO and the subcontractors of BESCO to engage in a strike or refusal, in the course of their employment, to perform services for their respective employers and restrained and coerced the employers, in each case with an object of forcing or requiring BESCO to cease doing business with Steiner Lumber Company.

The Board made the customary order to cease and desist the unfair labor practice and to post appropriate notices. (153 N.L.R.B. No. 85.)

The question at issue here is whether the picketing conducted by the Union at the BESCO building site constituted secondary picketing in violation of Section 8(b) (4) (i) (ii) (B) or was privileged as consumer picketing in accordance with National Labor Relations Board v. Fruit and Veg. Packers, 377 U.S. 58, 84 S.Ct. 1063, 12 L.Ed.2d 129. (Sometimes referred to as Tree Fruits.)

The respondent Union seeks to rely on Tree Fruits to justify its picketing of BESCO as consumer picketing. In that case the Union was distinctly picketing against one specific product, Washington State apples, being sold by Safeway Stores, a chain food market. Before picketing at any store, the Union advised the store manager, by letter, that the

picketing was only an appeal to customers not to buy Washington State apples and that it would not interfere with the work of store employees, or with deliveries to or pickups from the store. The pickets were forbidden to request customers not to patronize the store. The case at bar cannot be brought within the facts of the Tree Fruits case. Its rule is not applicable here. Neither is National Labor Relations Board v. Servette, 377 U.S. 46, 84 S.Ct. 1098, 12 L.Ed.2d 121, also relied on by respondent, factually analogous to the case at bar. In that case there were no pickets and the only threat involved the distribution of handbills to the public, which is a protected activity.

While the Board, in its decision and order, adopted the trial examiner's findings, conclusions and recommendations, it did not adopt all of his reasoning and his distinctions between the case at bar and the Tree Fruits case. See 153 N.L. R.B. 85. The Board said:

"We rely particularly upon the timing of the picketing, the absence of any effort to negate an appeal to employees of the various secondary employers, and the absence of any appeal for specific conduct on the part of consumers in reaching our conclusion that the picketing in this case did not constitute consumer picketing lawful under the Tree Fruits decision."

The principle enunciated in Tree Fruits permits a union to engage in picketing at the establishment of a secondary employer, so long as it is directed to his customers and not his employees, and is not an attempt to "restrain or coerce" the secondary employer to cease doing business with the primary employer. A mere facade of "consumer"

---

1. "(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to * * * handle or work on any goods * * * or to perform any services; or

"(ii) to threaten, coerce, or restrain any person engaged in commerce or in an in-

dustry affecting commerce, where in either case an object thereof is—

    *     *     *     *     *

"(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person * * *."

picketing cannot foreclose the Board from determining the true purpose of the union's conduct. What in actuality is employee-oriented conduct, or veiled coercion of the secondary employer, cannot by the simple use of the words "consumer directed", be given statutory protection. Past attempts to attribute lawful objectives to what in fact is an appeal to neutral employees of secondary employers, have not withstood the scrutiny of the Board and of the courts. N. L. R. B. v. Laundry, etc., Drivers Local No. 928, 262 F.2d 617 (C.A.9); Retail Fruit & Veg. Clerks U. v. National Labor Relations Bd., 249 F.2d 591 (C.A.9); United Steelworkers of America, AFL-CIO v. N. L. R. B., 294 F.2d 256 (C.A.D.C.); Brown Transport Corporation v. N. L. R. B., 334 F.2d 30 (C.A.5); N. L. R. B. v. International Hod Carriers, etc., 285 F.2d 397 (C.A.8), cert. den. 366 U.S. 903, 81 S.Ct. 1047, 6 L.Ed.2d 203; N. L. R. B. v. Highway Truckdrivers & Helpers, Local No. 107, 300 F.2d 317 (C.A.3).

■ Our scope of review is limited. Section 160(e), Title 29, U.S.C., provides in part:

"The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive."

See Universal Camera Corporation v. National Labor Relations Board, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456; Labor Board v. Denver Bldg. & Const. Trades Council, 341 U.S. 675, 691, 71 S.Ct. 943, 95 L.Ed. 1284. If facts are open to conflicting inferences, we are not at liberty to draw an inference different from the one drawn by the Board, even though it may seem more plausible and reasonable to us. In *Universal Camera Corporation*, supra, 340 U.S. at p. 488, 71 S.Ct. at p. 465, the court said:

"Nor does it mean that even as to matters not requiring expertise a court may displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*."

See also National Labor Relations Board v. Walton Mfg. Co., 369 U.S. 404, 405, 82 S.Ct. 853, 7 L.Ed.2d 829; National Labor Relations Board v. Nevada Consol. Copper Corp., 316 U.S. 105, 106–107, 62 S.Ct. 960, 86 L.Ed. 1305; National Labor Relations Board v. Link-Belt Co., 311 U.S. 584, 596–597, 61 S.Ct. 358, 85 L.Ed. 368; N. L. R. B. v. U.S. Divers Company, 308 F.2d 899, 905 (C.A.9); National Labor Relations Bd. v. Stanislaus Imp. & H. Co., 226 F.2d 377, 381 (C.A.9); National Labor Relations Bd. v. Cold Spring Granite Co., 208 F.2d 163, 165 (C.A.8); N. L. R. B. v. Local Union No. 369 of Int. Bro. of Elec. Wkrs., 341 F.2d 470, 472 (C.A.6).

■ We conclude that the findings of the Board are supported by substantial evidence considering the record as a whole and that the inferences drawn from the facts, by the Board, are reasonable and proper.

The petition for the enforcement of the Board's order is granted.