# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued March 9, 2006          Decided May 5, 2006

No. 05-1004

UNITED FOOD AND COMMERCIAL WORKERS UNION LOCAL
204,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

WILLIAM P. BARRETT, ET AL.,
INTERVENORS

———

Consolidated with
05-1131 and 05-1229

———

On Petitions for Review and
Cross-Application for Enforcement of an
Order of the National Labor Relations Board

———

*Renee L. Bowser* argued the cause and filed the briefs for petitioner United Food and Commercial Workers Union Local 204.

*Curtis L. Mack* argued the cause for petitioner Smithfield Packing Company, Inc. With him on the briefs was *E. Duncan Getchell, Jr.*

*Usha Dheenan*, Attorney, National Labor Relations Board, argued the cause for respondent. With her on the brief were *Ronald Meisburg*, General Counsel, *John H. Ferguson*, Associate General Counsel, *Aileen A. Armstrong*, Deputy Associate General Counsel, and *Fred B. Jacob*, Supervisory Attorney.

*Michael A. Carvin* argued the cause for intervenors. With him on the briefs were *Julia M. Broas* and *Willis J. Goldsmith*.

Before: RANDOLPH and TATEL, *Circuit Judges,* and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed PER CURIAM.

PER CURIAM: In 1992, the Smithfield Packing Company opened a large pork processing plant in Tar Heel, North Carolina. Shortly after the plant opened, the United Food and Commercial Workers Union took steps to organize the plant's employees. Those efforts culminated in two elections, one in 1994 and the other in 1997, both of which the Union lost. From the outset, Smithfield was exceptionally hostile to union organizing activities at the Tar Heel plant. According to National Labor Relations Board findings unchallenged here, the company threatened to fire employees who voted for the Union, to freeze wages and shut the plant if the employees unionized, and to discipline employees who engaged in union activity. It also interrogated employees about their union support, confiscated union materials, and videotaped and otherwise spied on its employees' union activities. *See Smithfield Packing Co., Inc.*, 344 N.L.R.B. No. 1, at 14-15 (Dec. 16, 2004).

The Board's General Counsel filed several complaints against Smithfield, and an ALJ issued a report in December 2000. Over a partial dissent, the Board adopted nearly all of the ALJ's recommended findings and most of his recommended remedies, including a broad cease-and-desist order forbidding Smithfield from violating the National Labor Relations Act (NLRA). *Id*. at 15-16. Smithfield and the Union now petition for review of the Board's order, and three of Smithfield's former lawyers have intervened in support of Smithfield's petition. The Board has filed a cross-application for enforcement.

"[F]indings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall . . . be conclusive." 29 U.S.C. § 160(f). What's more, "we do not reverse the Board's adoption of an ALJ's credibility determinations unless . . . those determinations are hopelessly incredible, self-contradictory, or patently unsupportable." *Cadbury Beverages, Inc. v. NLRB*, 160 F.3d 24, 28 (D.C. Cir. 1998) (internal quotation marks omitted).

Before reaching the merits, we observe that the Board is entitled to enforcement of all unchallenged portions of its order, and we therefore grant its petition as to those portions. *See Grondorf, Field, Black & Co. v. NLRB*, 107 F.3d 882, 885 (D.C. Cir. 1997).

We first address Smithfield's argument that the Board lacked substantial evidence to find that the company contravened NLRA section 8(a)(1) in establishing an overly broad no-solicitation/no-distribution policy. The Board's conclusion rests on testimony that Smithfield posted a sign outside the Tar Heel facility's parking lot describing an unlawfully broad policy. Although Smithfield insists that the Board's finding cannot stand because the General Counsel presented no evidence that a Smithfield employee actually saw

the sign, it never presented this argument to the Board and we will therefore not consider it. *See* 29 U.S.C. § 160(e) ("No objection that has not been urged before the Board . . . shall be considered by the court . . . ."). Smithfield also argues that no reasonable employee would have believed the concededly unlawful policy on the sign trumped the lawful policy the company published in its employee handbook. But the Board reasonably found that, in the atmosphere of intimidation and coercion under which Smithfield employees operated, employees might well have believed that the parking-lot sign stated Smithfield's real no-solicitation/no-distribution policy.

Second, Smithfield challenges the Board's determination that it unlawfully coerced Fred McDonald, a known union supporter, when McDonald's supervisor approached him and said, "Why do you all guys want a Union, the Union can't do anything for you but cause trouble between the workers and the Company." *Smithfield*, 344 N.L.R.B. No. 1, at 5. Relying on its earlier decision in *Action Auto Stores, Inc.*, 298 N.L.R.B. 875 (1990), the Board concluded that "the employer's conduct put the employee in a defensive posture because the employer, which controlled his livelihood, did not approve of his union activity." *Smithfield*, 344 N.L.R.B. No. 1, at 5. Smithfield contends that *Action Auto Stores* "does not apply to the record evidence" because the evidence of coercion was much stronger there than here. Smithfield's Br. 50. Yet the *Action Auto Stores* principle—that an employer's statement that union support would "cause trouble" can put an employee in a "defensive posture" and be unduly coercive under the right circumstances, *see Action Auto Stores*, 298 N.L.R.B. at 901-02—carries over notwithstanding the factual differences between the two cases. Given the intense and widespread coercion prevalent at the Tar Heel facility, the Board's reliance on *Action Auto Stores* was therefore proper.

Third, Smithfield argues that the Board lacked substantial evidence to conclude that it harassed and coerced Chris Council, a known union supporter. Although Council's supervisor, James Hargrove, ordered him to stamp hogs with a "Vote No" stamp, Smithfield insists that "the assignment did not unlawfully coerce Council to participate in Smithfield's anti-union effort" because Hargrove never "tricked" Council. Smithfield's Br. 53. But we think the Board could have reasonably concluded that Council's supervisor ordered him to engage in campaign activities in which Council never meant to participate; this amounts to coercion, plain and simple, whether or not Council was ever "tricked."

Fourth, Smithfield claims that the Board lacked substantial evidence to find the company violated NLRA section 8(a)(3) by discharging Rayshawn Ward, Lawanna Johnson, Margo McMillan, and Ada Perry. *See* 29 U.S.C. § 158(a)(3) ("It shall be an unfair labor practice for an employer . . . by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . ."). Reviewing the record, we find substantial evidence to support each decision.

When Rayshawn Ward acted as a union observer at the 1997 union election, a fight broke out after the ballots were counted. Although Ward claimed he never hit anyone, law-enforcement officials arrested him. Ward testified that three days after the fight, a Smithfield manager named Larry Johnson told him "I'm just tired of this Union shit and I'm ready to get my company back where it belong [sic]." J.A. 163. The ALJ credited this testimony, and the Board adopted his findings. Ward was fired two days later, ostensibly for his involvement in the fight. Because Johnson's statement exhibits powerful anti-union animus, even standing alone it provides substantial evidence for the Board's conclusion that Ward would not have

been fired but for his union support. This is particularly so given that "[w]e are even more deferential when reviewing the Board's conclusions regarding discriminatory motive, because most evidence of motive is circumstantial." *Vincent Indus. Plastics, Inc. v. NLRB*, 209 F.3d 727, 734 (D.C. Cir. 2000).

Similarly, the Board refused to credit Larry Johnson's testimony that he fired Lawanna Johnson for an attendance violation. Instead, it credited testimony that Larry threatened Lawanna with termination if she encouraged people to vote for the Union—and that Larry then fired Lawanna just three days later. Without more, the Board could reasonably have concluded that this supported a finding of anti-union animus. Although Lawanna had signed a last-chance agreement making her employment contingent on perfect attendance, the Board found that Smithfield had sometimes been lenient with other employees on "final warnings" for repeated attendance violations. *See Smithfield*, 344 N.L.R.B. No. 1, at 7; *see also* J.A. 257-59 (employee on final warning stayed home because God told her to, and instead of firing her, Smithfield gave her a "final final warning"). Substantial evidence therefore supports the Board's conclusion that Smithfield fired Lawanna for her union support, not for her attendance violation.

In attacking the findings of unlawful discharge against McMillan and Perry, Smithfield argues that the Board improperly relied on privileged testimony from a former manager, Sherri Buffkin. Yet even without Buffkin's testimony, substantial evidence supports the Board's conclusion that McMillan and Perry were fired for their union support. Shortly after Smithfield unlawfully interrogated McMillan about her position on unionization, McMillan was fired for her "continued negative approach." *Smithfield*, 344 N.L.R.B. No. 1, at 104. But according to McMillan's supervisor, Smithfield failed to follow its progressive discipline policy, instead firing her before

she had accrued enough warnings.  From this, the Board was entitled to infer—totally independent of the Buffkin testimony, *see id*. at 12 (finding that "even assuming arguendo that the cited attorney-client communications regarding the discipline of McMillan were privileged . . . the evidence establishes that [Smithfield] unlawfully discharged McMillan")—that her union support, and not her "negative approach," was the real reason for her discharge.

As for Perry's termination, Smithfield never contests that it threatened Perry for her pro-union beliefs, arguing instead that it would have fired Perry regardless of her union support because she threatened a co-worker.  Known around the plant as "Granny," Perry was sixty-one years old at the time of the alleged threat, and the person she supposedly threatened was a man in his early twenties.  Even her supervisor, who witnessed the purported threat, testified that he didn't take it seriously.  The Board had ample reason to refuse to credit this flimsy justification and instead find that Perry's termination violated NLRA section 8(a)(3).

The intervenors, three former Smithfield lawyers, join Smithfield in arguing that the Board impermissibly considered Buffkin's testimony relating to the veracity of one of her affidavits—testimony that intervenors argue was protected by the attorney-client privilege.  When confronted at the hearing with an earlier affidavit that appeared to contradict her testimony, Buffkin testified that the affidavit was not entirely true.  When pressed, she explained that even though she repeatedly told one of Smithfield's lawyers that portions of the affidavit were incorrect, he told her to sign it anyway.  Concerned that Smithfield's lawyers may have suborned perjury, the Board referred the matter to its Investigating Officer for investigation.

The Board argues that we lack jurisdiction to hear intervenors' arguments, and we agree. Intervenors never filed their own petition for review, instead arguing in support of Smithfield's petition. That petition, however, challenges the reliance on Buffkin's testimony only inasmuch as it relates to the McMillan and Perry discharges. We fail to see how the Board's conclusion that McMillan and Perry were unlawfully terminated aggrieves Smithfield's former lawyers. Because intervenors are therefore not "person[s] aggrieved by a final order of the Board" within the meaning of the NLRA—at least with respect to this portion of the Board's order—we lack jurisdiction to hear their arguments. *See* 29 U.S.C. § 160(f) ("Any person aggrieved by a final order of the Board granting or denying in whole or in part the relief sought may obtain a review of such order . . . .").

Intervenors insist we do have jurisdiction because the allegedly unlawful reliance on the Buffkin testimony led directly to the Board's decision to refer them for disciplinary proceedings. But the referral is no more a "final order" of the Board than is a General Counsel's filing of an unfair labor practice complaint against a company, and thus cannot ground our jurisdiction. *See Turgeon v. Fed. Labor Relations Auth.*, 677 F.2d 937, 938-39 (D.C. Cir. 1982) ("The General Counsel of the Board shall have final authority, on behalf of the Board, in respect of the investigation of charges and issuance of unfair labor practice complaints. . . . Such administrative determinations by the General Counsel are not denominated 'orders' in the Act, and the Act makes no provision for their review." (internal quotation marks, alterations, and citation omitted)).

Finally, both Smithfield and the Union challenge the Board's remedies—Smithfield because they are too severe, and the Union because they are not severe enough. Both face a

heavy burden: the Board's remedial authority is "a broad discretionary one, subject to limited judicial review," and a remedy "will not be disturbed unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." *Fibreboard Paper Prods. Corp. v. NLRB*, 379 U.S. 203, 216 (1964) (internal quotation marks omitted).

Smithfield argues that the Board inadequately explained why it imposed a broad cease-and-desist order forbidding the company from "interfering with, restraining, or coercing its employees in the exercise of their rights under . . . the Act." *Smithfield*, 344 N.L.R.B. No. 1, at 15. But unlike in the bargaining-order cases Smithfield relies on, *see* Smithfield's Br. 54-56 (citing, among other cases, *Peoples Gas Sys., Inc. v. NLRB*, 629 F.2d 35 (D.C. Cir. 1980)), we have never held that the Board has a heightened explanatory burden when imposing a cease-and-desist order. Rather, we have emphasized that such an order may be appropriate if the company in question "ha[s] a proclivity to violate the [NLRA], or has engaged in such egregious or widespread misconduct as to demonstrate a general disregard for the employees' fundamental statutory rights." *Federated Logistics & Operations v. NLRB*, 400 F.3d 920, 929 (D.C. Cir. 2005) (second alteration in original) (internal quotation marks omitted). In *Federated*, we upheld a broad cease-and-desist order based on a laundry list of unfair labor practices. Because the list of Smithfield's violations is even longer, we will similarly uphold the cease-and-desist order here.

Smithfield also insists that the Board had no basis for ordering it to provide employee names and addresses to the Union upon request. But as we explained in *Federated*, "it is long established that requiring the employer to disclose employee names and contact details to the union furthers NLRA objectives by encouraging an informed employee electorate and

by allowing unions the right of access to employees that management already possesses." *Id.* at 929 (internal quotation marks omitted). We therefore cannot say that the Board's order "is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." *Fibreboard Paper*, 379 U.S. at 216 (internal quotation marks omitted).

Nor can Smithfield prevail on its claim that the Board may not require it to notify everyone the company has employed since 1993 of the Board's decision. Upholding a similar notification order in *Teamsters Local 115 v. NLRB*, 640 F.2d 392 (D.C. Cir. 1981), we explained that

> [a]n employee who must scan the Board's notice hurriedly while at work, under the scrutiny of others, will not be as able to absorb its meaning and hence to understand his legal rights as one who reads it at home in a more leisurely fashion. Even more demanding than the needs of current employees are the needs of the former employees who were the direct victims of the Employer's violations; posting the notice at the plant hardly serves to communicate its contents to them.

*Id.* at 400-01 (internal citation and quotation marks omitted). Here, as in *Teamsters Local 115*, the Board could reasonably have concluded that a notification order was an appropriate remedial response to the widespread unfair labor practices at the facility.

As for the Union, it argues that the Board's failure to grant access remedies was error. But "[a] party challenging the Board's choice of remedy must show that the remedy is clearly inadequate in light of the findings of the Board." *Teamsters Local Union No. 639 v. NLRB*, 924 F.2d 1078, 1085 (D.C. Cir. 1991) (internal quotation marks omitted). The Union has failed

to make any such showing here; indeed, we fail to see how a broad cease-and-desist order forbidding Smithfield from violating the NLRA on pain of judicial contempt could be "clearly inadequate."

For these reasons, we deny both petitions for review and grant the Board's cross-application for enforcement of its order.

*So ordered.*